CHICAGO—FIRST DISTRICT—JANUARY, 1914.    509

American S. & G. Co. v. Chicago G. Co. et al., 184 Ill. App. 509.

## American Sand & Gravel Company, Appellee, v. Chicago Gravel Company and Joliet Sand and Gravel Company, Appellants.

### Gen. No. 18,879.

1. CONTRACTS, § 153*—*when agreement not to sell products of sand and gravel pits not in unreasonable restraint of trade.* Where a contract grants the exclusive right to excavate and remove sand and gravel from a tract of land for a certain period, and in consideration for the privilege granted the grantee agreed to make certain payments in money, to deliver to the grantor not to exceed twenty-five carloads of the product per day, and not to sell during the contract term any products from any of its pits for use in Cook county, except to the grantor, *held* that the negative covenant contained therein is not in unreasonable restraint of trade, but that its provisions are reasonable and only in partial restraint, and founded upon a valid consideration.

2. CONTRACTS, § 152*—*when negative covenant in partial restraint of trade not invalid.* Where the restriction of a negative covenant is partial, reasonable and calculated to foster the business of the covenantee, rather than to destroy competition, it cannot be *held* to be in violation of the Federal or State statutes, or against public policy, and therefore void.

3. CONTRACTS, § 329*—*when breach of contract waived.* A party to a contract waives a breach thereof by the other party where he makes no attempt to rescind therefor but avails himself of its benefits long after the breach was committed.

4. INJUNCTION, § 75*—*when lies to enforce negative covenant though remedy at law.* The right to an injunction for the enforcement of a negative covenant in a contract does not depend on the question whether complainant has an action at law or not to recover damages.

5. INJUNCTION, § 75*—*when violation of negative covenant may be enjoined.* Equity may interfere to restrain the violation of a negative provision in a contract although it cannot enforce the affirmative one where the negative and affirmative provisions are entirely separate and distinct.

6. ASSIGNMENTS, § 22*—*when assignment of rights under a contract operates to establish privity of estate.* Where a contract grants an exclusive privilege to take sand and gravel from certain land for a term of years and the grantee assigns his entire term

*See Illinois Notes Digest, Vols. XI to XV, same topic and section number.

leaving no reversionary right, there is a privity of estate between the assignee and the original grantor.

7. ASSIGNMENTS, § 25*—*when assignee of rights under a contract takes with notice of liabilities.* Where a contract grants a company a privilege of taking sand and gravel from certain premises and such company assigns all its interest thereunder to another company, the latter company will be charged with knowledge of the duties and liabilities of the former company under the contract where both companies had substantially the same persons as officers, each company occupying the same offices and sharing the same telephone service.

8. LICENSES, § 29*—*when grant of right to take gravel from land not grant of mere personal license.* A contract granting the exclusive right to take sand and gravel from certain premises, the right not being limited to any particular piece or section, clearly grants an interest in the land and not a mere personal license.

Appeal from the Superior Court of Cook county; the Hon. CHARLES A. MCDONALD, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1912. Affirmed. Opinion filed January 13, 1914. Rehearing denied January 27, 1914. *Certiorari* denied by Supreme Court (making opinion final).

ULLMANN, HOAG & DAVIDSON and VAIL & VETTE, for appellants; EDWARD P. VAIL and PARKER H. HOAG, of counsel.

JOHN T. RICHARDS, for appellee.

MR. PRESIDING JUSTICE SMITH delivered the opinion of the court.

Appellee, American Sand & Gravel Company, a corporation, filed its bill in the Superior Court of Cook county against appellants, Chicago Gravel Company and Joliet Sand and Gravel Company. Upon answers filed and the report of a master the court entered a decree substantially in accordance with the recommendation of the master, enjoining the appellants from selling any washed products prepared from sand and gravel mined and excavated from any or either of the gravel pits located on the premises known as the Gilbert, Hammond, Gifford and Millsdale properties,

or from any pits that were then and might be thereafter opened on any land owned or controlled by the Chicago Gravel Company, at any time during the life of a certain agreement dated August 10, 1905, for use within Cook county, to any one other 'than the complainant in the bill, except for use at points along the lines of the Elgin, Joliet & Eastern Railway and the Chicago, Lake Shore & Eastern Railway, as said respective railways were located on August 10, 1905, and referring the cause to a master to take an accounting of the damages sustained by complainant by reason of the violation of a negative covenant contained in the contract of August 10, 1905. From that decree appellants prosecute this appeal, and have separately assigned errors upon the record.

There is no substantial controverted question of fact in the case. Appellants present their case in this court upon questions of law mainly arising upon the contract and the assignment or transfer thereof, which formed the basis of the relations between the parties to the suit.

It substantially appears from the bill and the evidence that on June 15, 1905, a contract was entered into between one Louisa Gilbert and Sebastian Krug, by which Krug acquired the exclusive right to excavate and remove sand and gravel from a tract of land situated near Elgin, in Kane county, Illinois, during a period of fifteen years from June 15, 1905. July 15, 1905, the American Sand & Gravel Company, appellee, entered into a contract with Krug, under which appellee became possessed of the exclusive rights conferred by said first mentioned contract for the period of fourteen years and ten months from July 15, 1905. On August 10, 1905, appellee entered into a contract with appellant Chicago Gravel Company, by the terms of which the Chicago Gravel Company was granted the exclusive right to excavate and remove sand and gravel from the Gilbert land for a period of fourteen

years and nine months from said tenth day of August, 1905.

At the time of the making of said last mentioned contract, the Chicago Gravel Company owned or controlled a large amount of other lands containing deposit of sand and gravel. Under the contract between Louisa Gilbert and Krug and the contract between Krug and appellee, appellee was required to erect certain machinery on the gravel land for the purpose of mining or excavating the sand and gravel, and washing, cleaning and preparing the same for the market. This would involve the expenditure of a considerable sum of money by appellee, and as said Chicago Gravel Company owned a washing and screening plant adjacent to the Gilbert land and was operating the same at the time of the making of the contracts above mentioned, in order to avoid the expenditure required to be made under the Gilbert contract, a supplemental agreement was entered into between Louisa Gilbert and Krug, whereby the Gilbert contract was modified so as to permit the letting of the gravel land by Krug, and this supplemental contract also contained a provision waiving the requirement that a washing and screening plant should be erected on the Gilbert land, so as to enable the Chicago Gravel Company to prepare the product from the Gilbert land for the market by means of the plant which that company then had in operation adjacent to the Gilbert land.

In the fourth paragraph of the contract between the Chicago Gravel Company and appellee, complainant below, it was provided that the Chicago Gravel Company should supply appellee with not less than fifteen carloads per day of its washed products during each and every day, Sundays and holidays excepted, beginning with April 1st and ending December 1st in each year during said term of fourteen years and nine months, weather conditions permitting, and not to exceed twenty-five carloads per day during the period. The contract provided that it should be optional with

appellee whether it would accept and receive from the Chicago Gravel Company any more than fifteen carloads of said product per day.  The contract further provided that strikes, lockouts, interruptions to transportation, lack of cars, accidents and other causes beyond the control of the Chicago Gravel Company should excuse compliance with the terms of the contract while such condition continued; but provided further that in case of lack of cars appellee should be entitled to at least seventy-five per cent. of the available car supply.  The fourth paragraph of the contract also contained the following provision:

"It is further expressly understood and agreed that the said party of the second part (Chicago Gravel Company) shall not ship to any person, firm or corporation within Cook County, Illinois, other than said party of the first part (American Sand & Gravel Company, appellee) any of its washed products, and will not, after the first day of January, 1906, sell any of its washed products within said County of Cook except to said party of the first part, provided, however, that said party of the second part shall have the right to ship so much of said material as may be required to complete its present contract for the elevation of the tracks of the Chicago Junction Railway; it being hereby intended that said party of the first part shall have the exclusive right, within the County of Cook aforesaid, to all the washed product of gravel pits owned or controlled by said party of the second part; and that said party of the second part shall not sell the washed product of any of its gravel pits for use within said County of Cook to any other person, firm or corporation:  Provided, however, that said party of the second part shall have the right to ship product from its said gravel pits along the lines of the Elgin, Joliet & Eastern Railway and the Chicago, Lake Shore & Eastern Railway, as said respective railways are at present located."

Upon the execution of the last mentioned contract, possession of the Gilbert land was delivered to the Chicago Gravel Company and the latter proceeded to

Vol. CLXXXIV 33

514     APPELLATE COURTS OF ILLINOIS.

American S. & G. Co. v. Chicago G. Co. et al., 184 Ill. App. 509.

make preparations for and entered upon the perform-ance of the contract. During the season of 1907, the Chicago Gravel Company was unable for various rea-sons to furnish to appellee all of the sand and gravel to which it was entitled under the terms of the con-tract, but appellee took from the Chicago Gravel Com-pany all the material it could get. During the season of 1908, the Chicago Gravel Company offered to ap-pellee the fifteen carloads of product required under the terms of the contract, but appellee was unable to accept the full amount. Shipments, however, were made from time to time, all orders given being ac-cepted by the Chicago Gravel Company and all ma-terial shipped to appellee was paid for according to the terms of the contract. During the seasons of 1909 and 1910, the Chicago Gravel Company supplied sub-stantially all the material ordered by appellee, and the same was accepted and paid for by appellee accord-ing to the contract, and this condition of affairs con-tinued until the time of the hearing of the cause before the master.

The bill avers, and the evidence shows, that during the years of 1908, 1909 and 1910, the Chicago Gravel Company shipped a number of cars of washed sand and gravel into Cook county for use in Cook county in violation of the negative covenant in said contract above set forth. In May, 1911, appellee, having learned that washed products from the pits of the Chicago Gravel Company were being shipped and sold in Cook county, filed its bill in the Superior Court of Cook county, alleging the violation of the negative coven-ant contained in the contract, and set forth that sales of such material had been made by the Chicago Gravel Company, and that although warned to desist from doing so, said company still continued to sell to sundry persons, firms and corporations, whose names are set out in the bill, and to other persons and corporations to appellee unknown, washed sand and gravel in Cook county from its gravel pits, and continues to make

shipments and sell products in violation of the covenant above set forth, and asking that the Chicago Gravel Company be enjoined from the violation of the negative covenant, and for an accounting of the material·sold by the Chicago Gravel Company in violation of the covenant, and that the Chicago Gravel Company be required to set forth the price at which the said washed products were sold, the names of the persons, firms and corporations to whom such sales were made, and that an accounting of the profits realized by the Chicago Gravel Company from such sales in violation of the terms of the contract be taken, and that the Chicago Gravel Company be required to pay appellee all the profits realized by it from such sales.

Appellee, having learned that appellant, Joliet Sand and Gravel Company, on or about January 1, 1911, had entered into an agreement with the Chicago Gravel Company, whereby the latter company granted to the Joliet Sand and Gravel Company the right to excavate gravel from its gravel pits for a period of ten years from the date of the contract, and that the Joliet Sand and Gravel Company was acting under said contract in connection with the Sand & Gravel Company a party defendant, and, afterwards, on July 15, 1911, a supplemental bill was filed by appellee.

The amended and supplemental bill sets out the two contracts above referred to between appellee and the Chicago Gravel Company, and the Chicago Gravel Company and the Joliet Sand & Gravel Company, and alleges that the agreements were made for the purpose of enabling the Chicago Gravel Company to evade the force and effect of its contract of August 10, 1905, and that James A. Hart, president of the Chicago Gravel Company, is also president of the Joliet Sand and Gravel Company; that both companies occupy the same or connecting offices in the city of Chicago, use the same telephone service, and that the Joliet Sand and Gravel Company has sold and shipped to divers and sundry persons, for use within Cook county, large

516    APPELLATE COURTS OF ILLINOIS.

American S. & G. Co. v. Chicago G. Co. et al., 184 Ill. App. 509.

quantities of said washed products, and which, under the terms of the contract of August 10, 1905, the Chicago Gravel Company had no right to sell directly or indirectly. The supplemental bill avers that the Joliet Sand and Gravel Company is chargeable with notice of the provisions of said contract of August 10, 1905, and acquired no greater rights from the Chicago Gravel Company than were granted by appellee to it under the contract, and that the Joliet Sand and Gravel Company was bound to the performance of all the covenants contained in the contract between appellee and the Chicago Gravel Company. The supplemental bill then alleges the violation of the provisions of the contract by the Joliet Sand and Gravel Company, and prays for an accounting.

It is admitted that the Chicago Gravel Company violated the negative covenant of the contract of August 10, 1905, during the years of 1909 and 1910. It is also admitted in the record that at the time the contract was made between the Chicago Gravel Company and the Joliet Sand and Gravel Company of January 1, 1911, James A. Hart was president and F. W. Renwick was vice president and general manager of both appellant companies, and that they continued to be such officers of both companies up to the time of the hearing before the master.

The first question to be considered is the validity of the contract of August 10, 1905, between the American Sand & Gravel Company, appellee, and the Chicago Gravel Company, appellant.

By the recitals and terms of that agreement it appears that a copy of the agreement of June 15, 1905, between Louisa Gilbert and Sebastian Krug, was attached thereto, marked "Exhibit A." It was also recited that the American Company had acquired from Krug for the term of fourteen years and ten months all the rights and privileges granted to Krug under his agreement with Gilbert, subject to all the conditions and limitations therein contained except as modi-

fied and changed by the supplemental agreement between Gilbert and Krug, a copy of which was also attached marked "Exhibit B." The agreement of August 10, 1905, gives and grants to the Chicago Gravel Company the exclusive right to enter upon the Gilbert property and to take and remove therefrom gravel, sand and stone, and dirt which may cover the same. In consideration therefor the Chicago Gravel Company makes the covenants and agreements contained in the second clause of the agreement. In further consideration therefor the Chicago Gravel Company, in the third clause of the agreement, agrees to pay the complainant two thousand four hundred dollars in cash to cover the expenses theretofore incurred by Krug and the complainant in obtaining the privilege granted in the June 1ᵤ, 1905, agreement as modified, and a royalty of three cents per cubic yard for each and every cubic yard excavated and removed in excess of 40,000 yards; and further to pay one thousand two hundred dollars during each and every year of the period covered by the contract which should be applied on the royalties reserved. In further consideration for the privileges granted, the Chicago Gravel Company makes the agreements contained in the fourth clause of the agreement, including the negative clause or agreement in question, which has been set forth above.

In behalf of appellants it is argued that the negative covenant in question is in unreasonable restraint of trade, and is in restraint of the alienation of personal property, and therefore equity will not enforce it.

For the purpose of considering this question, it will aid us to summarize the substance of the provisions of the contract. The complainant granted certain privileges to the Chicago Gravel Company. In consideration therefor the Chicago Gravel Company agreed: (1) to pay two thousand four hundred dollars in cash; (2) to pay not less than one thousand two hundred dol-

lars per year and the royalty named in the contract; (3) to deliver to appellee not to exceed twenty-five carloads of its washed product per day during the term of the contract at the prices named therein; and (4) that it would not sell, during the contract term of fourteen years and nine months, any washed products from any of its pits for use in Cook county, except to complainant.

Reading the provisions of the contract with these main features in mind, and looking into the facts and circumstances surrounding the parties at the time the contract was entered into, we think it is clear that each and all of the covenants of appellant, Chicago Gravel Company, formed and constituted the agreed consideration for the privileges granted to that company by the complainant. It is only reasonable to say, in view of the circumstances and the situation of the parties and the provisions of the contract, that if the Chicago Gravel Company refused to agree to any one of the four substantive provisions of the contract above set forth, the privileges described in the contract would not have been granted by the American Company. It is also quite apparent that the covenant in the fourth clause of the agreement, that the Chicago Gravel Company "will not after the first day of January, 1906, sell any of its washed products within said County of Cook, except to said party of the first part," etc., was not the least important part of the consideration named in the contract, for it tended directly to foster and increase the business of the American Company. If the restriction of the covenant is partial, reasonable and calculated to foster the business of the American Company, rather than to destroy competition, it cannot be held to be in violation of the Federal or the State statutes, or against public policy, and therefore void. We think the contract is not one in general restraint of trade, but that its provisions in that respect are reasonable and only in partial restraint, and are founded upon a valid consideration, and were intended

to foster and increase the business of the American Company. The contract in our opinion must be held valid upon the principles and for the reasons clearly stated in *Southern Fire Brick & Clay Co. v. Garden City Sand Co.,* 223 Ill. 616, and *Hursen v. Gavin,* 162 Ill. 377, and the authorities cited in those cases.

We next consider the question whether a breach of the expressed negative covenant may be enjoined. The bill seeks no specific enforcement of the contract other than an injunction against the continuing breach of that covenant, and the decree does not otherwise command the specific performance of the contract.

On this question the case of *Southern Fire Brick & Clay Co. v. Garden City Sand Co., supra,* which cannot be distinguished from the case before us on principle, is both instructive and decisive. In the opinion in that case, the Court quotes with approval from *Singer Sewing Mach. Co. v. Union Button-Hole & Embroidery Co.,* 1 Holmes (U. S.) 253. A part of the quotation is:

"It was formerly thought that an injunction would not be granted to restrain the breach of any contract unless the contract were of such a character that the court could fully enforce the performance of it on both sides. Upon this ground there were many decisions refusing to interfere with contracts for personal services, however flagrant might be the breach of them. *. * * But all these cases were overruled by one of the ablest chancellors who has adorned the woolsack, in *Lumley v. Wagner.* * * * It is now firmly established that the court will often interfere by an injunction where it cannot decree performance."

The Court then says:

"The prayer for performance was refused but the injunction ordered. (See also *Consolidated Coal Co. v. Schmisseur,* 135 Ill. 371.) Numerous decisions from other States might be cited to the same effect."

It is however argued in behalf of appellants that this is a bill to enforce the contract, and that it will not lie because there is no mutuality of remedy as dis-

tinguished from mutuality of obligation in the contract set up in the bill. It is conceded by counsel for appellants that there is some confusion in the authorities in regard to these two classes of mutuality, and whether equity may interfere by injunction to prevent a breach of the negative covenant when the affirmative is of such a nature that it cannot be specifically enforced by a judicial decree. We are of the opinion that the later and better considered doctrine is that equity may interfere to restrain the violation of a negative provision although it cannot enforce the affirmative one, where the negative and affirmative parts of the contract, as in this case, are entirely separate and distinct. 2 High on Injunctions (2d Ed.) pp. 728, 763, 764; Waterman's Specific Performance of Contracts, sec. 110; Kerr on Injunctions (3d Ed.) p. 357; *Lumley v. Wagner,* 1 DeG. M. & G. 604; *Singer Sewing Mach. Co. v. Union Button-Hole & Embroidery Co., supra;* and *Southern Fire Brick Co. v. Garden City Sand Co., supra,* where it is said:

"While a court of equity might not compel him to mine and sell the product to complainants in conformity with his agreement, yet there is equitable jurisdiction to prevent him from selling to other parties."

In Pomeroy on Equity Jurisprudence & Equitable Remedies, vol. 2, sec. 769 (pp. 1291, 1292), the learned author says:

"The frequent statement of the rule of mutuality, 'that the contract to be specifically enforced must, as a general rule, be mutual, that is to say, such that it might at the time it was entered into have been enforced by either of the parties against the other' is open to so many exceptions that it is of little value as a rule."

As said in the *Singer Sewing Mach. Co.* case, *supra,* the fair result of the later cases may be thus expressed:

"If the case is one in which the negative remedy of injunction will do substantial justice between the par-

ties, by obliging the defendant either to carry out his contract or lose all benefit of the breach, and the remedy at law is inadequate, and there is no reason of policy against it, the court will interfere to restrain conduct which is contrary to the contract, although it may be unable to enforce a specific performance of it.''

Nor does the right to an injunction for the enforcement of the negative covenant in this contract depend on the question whether complainant has an action at law or not to recover damages. *Southern Fire Brick & Clay Co. v. Garden City Sand Co., supra.* ''A court of equity fastens upon the real contract and compels the execution of the very thing covenanted to be done.'' *Ropes v. Upton,* 125 Mass. 258. This is the rule even though the complainant has a right of action at law or has taken a bond in connection with the covenant.

It is contended in argument that the negative covenant in question is a personal covenant and not binding on third parties either with or without notice. With this contention we cannot agree. The contract between Gilbert and Krug conveyed the privileges thereby granted for a period of fifteen years, or until June 15, 1920. The contract between Krug and appellee, dated July 15, 1905, and the privileges granted by it, extended for the period of fourteen years and ten months, or until May 15, 1920, leaving a remainder of one month still vested in Krug. The contract between appellee and the Chicago Gravel Company, dated August 10, 1905, assigned or transferred the privileges thereby granted for the period of fourteen years and nine months, or, in other words, until May 10, 1920, leaving a remainder of five days in appellee out of the period granted to appellee by Krug. The contract between the Chicago Gravel Company and the Joliet Sand and Gravel Company dated January 1, 1911, assigned and transferred the privileges and rights therein expressed to the Joliet Sand and Gravel Company for a period of ten years, or until January 1, 1921, seven months and twenty-one days beyond the

522     APPELLATE COURTS OF ILLINOIS.

American S. & G. Co. v. Chicago G. Co. et al., 184 Ill. App. 509.

term granted to the Chicago Gravel Company by appellee under the contract of August 10, 1905. The whole term which was vested in the Chicago Gravel Company was, by the contract of January 1, 1911, vested in the Joliet Sand and Gravel Company, and the latter company, by reason of that fact, became and was vested with all the rights acquired by the Chicago Gravel Company and subject to all the liabilities of the Chicago Gravel Company thereunder; and we think that appellant, the Joliet Sand and Gravel Company, became bound to the performance of all the covenants contained in the contract of August 10, 1905, which, by its terms, were required to be performed by the Chicago Gravel Company.

The contract by which appellant, the Joliet Sand and Gravel Company, acquired the right and privilege of going upon the Gilbert land and excavating sand and gravel therefrom was a contract with reference to the use of that property and was more than a license to go upon the property and remove sand and gravel. In the case of *Consolidated Coal Co. v. Peers,* 150 Ill. 344, it was contended that the contract in that case was a mere personal license, but the Court said, on page 350:

"A license is an authority to do a particular act or acts upon another man's land without possessing any estate therein.  *  *  *  The lease here involved invests the lessee with the 'sole and exclusive right' to mine and operate in coal on certain described lands. The right granted is not limited to any particular vein or stratum, but extends to all coal under said lands, and it is exclusive of the whole world, including the lessors themselves, and is for the full term of twenty-five years from the date thereof. The law, as we understand it, is, that a lease of the right and privilege to mine or take away stone or coal from the lessor's land is the grant of an interest in the land, and not a mere license to take stone or coal."

In *Gartside v. Outley,* 58 Ill. 210, it was contended that the instrument there involved was not a lease.

The contract granted certain lands for an indefinite period with permission to take, under certain conditions specified in the grant, all the coal contained in said lands. It also contained mutual covenants and the provision of forfeiture in case of noncompliance on the part of the lessee. The Court said:

"We think the fair construction to be given to that instrument is that it is in the nature of a lease and creates only the relation of lessor and lessee."

To the same effect are *Harvey Coal & Coke Co. v. Dillon*, 59 W. Va. 605, and *Heywood v. Fulmer,* 158 Ind. 658. In the *Heywood* case, the written instrument was in the form of a receipt for money paid, executed by the owner of the land, and gave to the person named therein exclusive right to all the sand and gravel on certain premises for one year, and excluding all other persons from said premises, and the Court held that it amounted to a lease and not a mere license, and was valid against the grantee.

In that case the Court said:

"A lease may not only confer upon the lessee the right to the occupancy of the leased premises, either generally for the time limited, or for some specific purpose, or in some specific manner, or the right to occupy and cultivate the land and to remove the products of cultivation, but it may confer upon him the power to occupy and remove a portion of that which constitutes the land itself. Familiar and common examples of such leases are those authorizing the lessee to quarry and remove stone, to open mines and remove ores, minerals, mineral coal, etc., or to sink wells for procuring and removing petroleum and natural gas. * * * In our opinion the writing in question contains all of the essential elements of a valid lease."

So we think in this case the contract between appellee and the Chicago Gravel Company gave the latter company the right to mine and remove any sand, stone, dirt or gravel on the premises, and the Chicago Gravel Company was not limited to any particular piece or section, but had an exclusive right to take all the sand,

gravel, etc., on said premises. It, therefore, clearly granted an interest in the land, and was not a mere personal license.

The contract between the Chicago Gravel Company and the Joliet Sand and Gravel Company operated as an assignment to the latter company of the contract of August 10, 1905. It transferred the entire term of the Chicago Gravel Company and left no reversionary right. It was, therefore, an assignment of the entire term of the Chicago Gravel Company, and this established a privity of estate between the parties to it. *Stewart v. Long Island R. Co.,* 102 N. Y. 601; *Sexton v. Chicago Storage Co.,* 129 Ill. 318; *Chicago Attachment Co. v. Davis Sewing Mach. Co.,* 142 Ill. 171; *Lee v. Payne,* 4 Mich. 106; *Coal & Coke Co. v. Tax Commissioner,* 59 W. Va. 605.

If, however, we are mistaken as to the effect of the contract of January 1, 1911, we think that in view of the fact that the officers of the two appellant companies were substantially the same, that the same person was president of both companies, and that the same person was vice-president and general manager of both companies, there can be no doubt that the Joliet Sand & Gravel Company had full notice of the rights, duties and liabilities of the Chicago Gravel Company under the contract of August 10, 1905, at the time that the contract of January 1, 1911, was made. The further facts that the Chicago Gravel Company and the Joliet Sand and Gravel Company have always occupied one and the same suite of offices in the city of Chicago, that the lease of their offices was for several years in the name of the Chicago Gravel Company, and the present lease is in the name of the Joliet Sand and Gravel Company, that both companies have always shared the same telephone service and their telephone numbers have been the same, show such intimate relations between the two companies in the same business that there is no reasonable ground for believing that the Joliet Sand and Gravel Company did not have full

knowledge of the contracts relating to the Gilbert property under which the Joliet Sand and Gravel Company finally obtained its interest under which it is operating.

The above facts are only a portion of the facts appearing in the record which tend to show that while technically two different corporations they virtually represent and control the same interests. We think the injunction properly included the Joliet Sand and Gravel Company.

The negative covenant in question is a part of the consideration for the making of the contract in which it appears, and that contract, as we have seen, relates to the land and the use of it. We need not hold and do not decide that it is a covenant running with the land. It is sufficient that it is a covenant which both appellants were bound to observe under the facts shown in the record.

Other points are argued at length in the briefs of counsel. Many of them we do not regard as material to the decision of the case.

There is only one other contention made on behalf of the Chicago Gravel Company to which we deem it material to refer. It is contended that because complainant did not take from the Chicago Gravel Company fifteen carloads of gravel per day during the year 1908, the negative covenant in question cannot be enforced. The evidence is undisputed, and the master so finds, that there was a failure on the part of the Chicago Gravel Company to furnish appellee prior to 1908 the amount of sand and gravel demanded and to which appellee was entitled by the contract, and that appellee was unable to accept the minimum amount during the year 1908. But it is not shown or attempted to be shown that the Chicago Gravel Company made any attempt to forfeit or rescind the contract of August 10, 1905, on that account, or that it offered to surrender the rights acquired by it under that contract. It appears on the contrary that the Chicago Gravel Company attempted to evade the

negative covenant and still retain the benefit of all other provisions of the contract. It seems to have failed to perform its contract during the year 1907, but in 1908 it demanded strict performance of the contract by appellee. At the beginning of 1909 it tried to repudiate the negative covenant but was notified by appellee that it would be held to the performance of the entire contract. The written evidence in the form of letters shows conclusively that the parties proceeded under the contract during 1909 and 1910, appellee paying the prices fixed by the contract in accordance with the terms thereof. It is not claimed anywhere that the rights and privileges granted by the contract have ever been surrendered. If, therefore, there was a breach in 1908 by appellee, the breach was waived by the Chicago Gravel Company when it retained possession of the Gilbert property and in other respects availed itself of the benefits of the contract in question after the alleged breach by appellee had been committed. If appellee violated the contract during the year 1908, the Chicago Gravel Company might then have elected to terminate the contractual relations and surrender the Gilbert property; on the contrary, it elected to proceed under the contract and is bound to the performance of all its covenants. The rule is so well established that it seems unnecessary to cite any authorities. Pomeroy in his Equity Jurisprudence, vol. 6, sec. 806, says:

"Of course, a waiver of the condition makes the contract operate against the waiver, and equity will then treat it as any other contract."

Fry in his work on Specific Performance (5th Ed.) sec. 940, says:

"A defendant who has waived the performance by the plaintiff of what was on his part to be performed cannot, of course, use the non-performance as a defense."

Page on Contracts, vol. 3, p. 2217, says:

"If the party originally in default performs before

the adversary party elects to treat it as a breach, his rights under the contract stand as if the contract had never been broken, except as concerns his liability for damages. Subsequent breach by the party not in default may prevent the latter from recovery and in such case he can not revert to the original breach as a discharge.''

To the same effect is *Pratt v. S. Freeman & Sons Mfg. Co.*, 115 Wis. 648.

Finding no error in the decree, it is affirmed.

*Affirmed.*